IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 24-cv-01131-PAB-TPO

MATTHEW WINTER,

Plaintiff,

v.

PLATTE VALLEY SCHOOL DISTRICT RE-7,

Defendant.

---

## ORDER

---

This matter comes before the Court on Defendant's Motion for Summary
Judgment [Docket No. 34]. Defendant Platte Valley School District RE-7 (the "District")
moves under Federal Rule of Civil Procedure 56 for summary judgment on the disability
discrimination and failure-to-accommodate claims brought against it under federal and
Colorado law. Docket No. 34 at 1-2. Plaintiff Matthew Winter filed a response, Docket
No. 40, and the District filed a reply. Docket No. 43. The Court has jurisdiction
pursuant to 28 U.S.C. § 1331.

## I. UNDISPUTED FACTS[1]

### A. <u>Application and Hiring</u>

Mr. Winter applied for the Technology Aide position with the District on July 22,
2021. Docket No. 34 at 2, ¶ 1. Technology Aides are non-classified, at-will employees
who do not have contracts; instead, they receive a notice of assignment for one school

---

[1] The following facts are undisputed unless otherwise noted.

year.  *Id.*, ¶ 2.  In early August 2021, Michael Jakel, the District's Director of

Technology, and Technology Specialists Dawn McConkey and Wendi Meyer

interviewed Mr. Winter.  *Id.*, ¶ 3.  Mr. Jakel, who was ultimately responsible for deciding

who to hire, selected Mr. Winter.  *Id.*, ¶ 4.[2]  Mr. Winter was provided with a notice of

assignment that stated his employment term ran from August 10, 2021 through June 30,

2022.  *Id.*, ¶ 5.  The notice of assignment stated that Mr. Winter or the District could end

Mr. Winter's employment for any reason with two weeks' notice.  *Id.*

### B.  Job Duties, Structure of the Technology Department, and Ticketing

Mr. Winter's job duties included: (1) troubleshooting technology problems; (2)

performing routine maintenance on hardware as directed, cleaning, and re-imaging

computers; (3) maintaining inventory of technology hardware and software; (4) installing

hardware and software as directed; (5) troubleshooting problems with student devices

and student accounts, including resetting user passwords; and (6) other duties as

assigned.  *Id.* at 2-3, ¶ 6.  The Technology Department had five employees: Mr. Jakel,

two Technology Specialists, and two Technology Aides.  *Id.* at 3, ¶ 7.  The Director of

Technology supervises the Technology Specialists and Aides.  *Id.*, ¶ 9.  Technology

Specialists support District hardware and software for staff and students including

---

[2] Mr. Winter disputes this fact, stating that Mr. Jakel "recommended that Plaintiff
be hired; however, the Board of Education ultimately decided whether to hire Plaintiff."
Docket No. 40 at 2, ¶ 4.  To support his argument, Mr. Winter cites only to "Ex. 1."  *Id.*
As will be noted in subsequent parts of this order, many of Mr. Winter's attempts to
create disputes of fact violate the Court's practice standards by failing to provide a
specific reference to material in the record supporting the denial.  *See* Practice
Standards (Civil cases), Chief Judge Philip A. Brimmer, § III.F.3.b.iv.  The Court
believes Mr. Winter means to reference Docket No. 40-1 at 1, 28:21-24, which states
that "ultimate employment decisions are approved and authorized by the Board of
Education."  The Court finds that this fact does not contradict the District's asserted fact.
Moreover, the dispute is immaterial for purposes of this order.  The Court deems this
fact admitted.

working with Technology Aides to ensure technology needs are met for District schools. *Id.*, ¶ 8.  When a Technology Aide is unable to solve a problem for District staff or students, a Technology Specialist provides a higher level of expertise to troubleshoot a problem.  *Id.*

When a Technology Aide works on a problem, he documents his work by creating a "ticket" noting what he did.  *Id.*, ¶ 10.  For example, a ticket would identify the machine that the Technology Aide is working on and the problem with the machine.  *Id.* In the ticket system, the Technology Aide documents the steps he took to resolve the problem, and the outcome of each step used.  *Id.*, ¶ 11.  If the Technology Aide is successful, he documents that the particular strategy solved the problem in the ticket system and returns the machine to the assigned user.  *Id.*, ¶ 12.  If the Technology Aide is unable to resolve the problem, he sends the machine to a Technology Specialist.  *Id.*, ¶ 13.  Each item must be documented in the ticketing system to ensure Technology Specialists know what has been tried, and the outcome of each attempt.  *Id.*, ¶ 13.  This prevents a Technology Specialist from having to duplicate the same strategies, helps to track problems with single machines and identifies whether there are similar problems arising across the District.  *Id.* at 3-4, ¶ 15.

### C.  Initial Disclosure of Disability and Request for Accommodation

Within the first two months of his employment, Mr. Winter notified Mr. Jakel, Ms. Meyer, and Ms. McConkey that he struggled with memory issues and sometimes completed tasks slowly.  *Id.* at 4, ¶ 16.[3]  On November 3, 2021, Mr. Winter emailed Mr.

---

[3] Mr. Winter disputes this fact, stating that he "informed Mr. Jakel, Dawn McConkey ("Ms. McConkey"), and Wendi Meyer ("Ms. Meyer") on his first day of employment of his disability."  Docket No. 40 at 3, ¶ 16.  Mr. Winter does not provide a specific reference to the material in the record to support his dispute.  The Court

Jakel, Ms. Meyer, and Ms. McConkey, telling them that he had a seizure in 2015 and

had subsequently been diagnosed with PTSD and brain damage. *Id.*, ¶ 17. Mr. Winter

asked that the recipients of the email be patient with him in completing job functions. *Id.*

Mr. Jakel and Mr. Winter discussed Mr. Winter's needs. *Id.*, ¶ 19. When Mr. Jakel

asked what Mr. Winter needed to do his job, Mr. Winter stated that he benefits from

written instructions, including checklists. *Id.*, ¶ 20.[4] Mr. Jakel, Ms. McConkey, and Ms.

Meyer provided Mr. Winter with written instructions and checklists to perform his job

duties. *Id.*, ¶ 21.[5] For example, Mr. Winter was provided with written instructions

regarding different ways to change a password on a computer; a checklist for how to

reimage computers, as well as instructions on how to reimage different brands of

computers; a student computer troubleshooting flow chart; and several other checklists.

*Id.* at 4-5, ¶ 22.[6] Mr. Winter also told Mr. Jakel he was able to learn and remember

---

believes Mr. Winter means to reference Docket No. 40-2 at 2-3, 50:22-51:17. In any
event, the two asserted facts do not contradict each other, as the first day of work is
within the first two months of work. Moreover, the Court finds that the exact date on
which Mr. Winter disclosed his disability is immaterial for the purposes of this order.
The Court deems this fact admitted.
   [4] Mr. Winter disputes this fact, stating that "[t]hroughout Plaintiff's employment,
Plaintiff requested several forms of accommodation for his disability which were not
limited to written instructions." Docket No. 40 at 3, ¶ 20. The Court finds this to be
nonresponsive and deems this fact admitted.
   [5] Mr. Winter disputes this fact, stating that "Plaintiff was not involved in the
drafting or development of any checklists or instructions to address his needs, and the
checklists or instructions provided by Defendant did not address all Plaintiff's needs
and/or job duties. Instead, Defendant provided pre-drafted checklists to Plaintiff without
discussing whether the checklists addressed Plaintiff's needs, and Defendant expected
Plaintiff to draft his own checklists without an interactive process." Docket No. 40 at 3,
¶ 21. The Court finds this to be nonresponsive and deems this fact admitted.
   [6] Mr. Winter disputes this fact, stating that "Plaintiff was not involved in the
drafting or development of any checklists or instructions to address his needs, and the
checklists or instructions provided by Defendant did not address all Plaintiff's needs
and/or job duties." Docket No. 40 at 3, ¶ 22. The Court finds this to be nonresponsive
and deems this fact admitted.

things better if he took notes and developed his own checklists.  *Id.* at 5, ¶ 23.

Accordingly, Mr. Jakel, Ms. McConkey, and Ms. Meyer allowed Mr. Winter to take notes,

regularly reminded him to take notes when they observed that he was not, and

supported him in the development of his own checklists.  *Id.*, ¶ 24.[7]

In spite of receiving these accommodations, Mr. Winter struggled to perform his

job duties during the 2021-2022 school year.  *Id.*, ¶ 25.[8]  Mr. Winter's tickets contained

inaccurate information, and he had a low success rate with regard to resolving problems

with computers.  *Id.*, ¶ 26.[9]  Mr. Winter routinely failed to enter information into the

---

[7] Mr. Winter disputes this fact, stating that "Plaintiff was not involved in the
drafting or development of any checklists or instructions to address his needs, and the
checklists or instructions provided by Defendant did not address all Plaintiff's needs
and/or job duties.  Instead, Defendant provided pre-drafted checklists to Plaintiff without
discussing whether the checklists addressed Plaintiff's needs, and Defendant expected
Plaintiff to draft his own checklists without an interactive process."  Docket No. 40 at 4,
¶ 24.  The Court finds this to be nonresponsive and deems this fact admitted.

[8] Mr. Winter disputes this fact, stating that "Mr. Jakel testified in his deposition
that he does not remember discussing a disability with Plaintiff.  When Mr. Jakel was
asked if he became aware that Plaintiff had a disability, Mr. Jakel answered, 'No.'  No
interactive process ever occurred.  *See* Ex. 3.  Defendant did not conduct an interactive
process and did properly determine whether a certain accommodation actually
addressed Plaintiff's needs.  Further, Plaintiff performed his jobs satisfactorily, and
Plaintiff did not receive any performance plans or performance-related discipline during
the 2021-2022 school year."  Docket No. 40 at 4, ¶ 25.  The first part of the dispute,
which involves the issue of whether an interactive process occurred and whether the
accommodation is sufficient, is nonresponsive.  The second part of the dispute, which
involves the issue of whether Mr. Winter performed satisfactorily, is not supported by
any citation to the record.  The Court therefore deems this fact admitted.

[9] Mr. Winter disputes this fact, stating that, "Despite Defendant's allegations that
all information is documented in Defendant's ticketing system, Defendant has yet to
produce any tickets from Defendant's ticketing system that purport to show that Plaintiff
did not resolve any alleged problem(s) and/or entered inaccurate information into any
tickets."  Docket No. 40 at 4, ¶ 26.  To the extent that Mr. Winter argues that there is a
lack of evidence that his tickets were problematic, the Court notes that, even if the
District does not identify specific tickets that contained deficiencies, the District has
identified evidence of these deficiencies in the form of Mr. Jakel's declaration.  *See*
Docket No. 34-1 at 7-8, 10 ¶¶ 23, 25-26, 29; *see also* Declaration of Dawn McConkey,
Docket No. 34-16 at 3-5, ¶¶ 9, 12-13, 15; Declaration of Wendy Meyer, Docket No. 34-

ticketing system and frequently entered inaccurate information into the ticketing system.
*Id.*, ¶ 27.[10]  Although Mr. Jakel understood that there is learning curve, he was
concerned because Mr. Winter did not make as much progress as he expected.  *Id.*,
¶ 28.[11]  Despite Mr. Winter's poor progress, Mr. Jakel offered Mr. Winter another
assignment for the 2022-2023 school year.  *Id.*, ¶ 29.[12]

---

15 at 2-4, ¶¶ 6-11; Docket No. 34-18 at 4; Docket No. 34-22 at 1-3.  Mr. Winter,
meanwhile, has failed to identify any evidence that supports his contention that his
tickets did not contain deficiencies.  The Court therefore deems this fact admitted.

[10] Mr. Winter disputes this fact, citing to the argument he made in support of his
dispute of the prior fact.  *See* Docket No. 40 at 4, ¶ 27.  For the same reason noted in
footnote 9, the Court deems this fact admitted.

[11] Mr. Winter disputes this fact, stating that "Plaintiff repeatedly disclosed his
disability, yet Mr. Jakel testified in his deposition that he does not remember discussing
a disability with Plaintiff.  When Mr. Jakel was asked if he became aware that Plaintiff
had a disability, Mr. Jakel answered, 'No.'  No interactive process ever occurred."
Docket No. 40 at 4-5, ¶ 28.  The Court finds this to be nonresponsive and deems this
fact admitted.  Moreover, the Court notes that Mr. Winter's denial leaves out pertinent
portions of Mr. Jakel's deposition testimony.  In response to the question "[y]ou
mentioned that at some other time you became aware that Mr. Winter had a disability; is
that correct?" Mr. Jakel responded "[n]o."  Docket No. 40-3 at 2-3, 53:24-54:2.  The next
question was "[s]o is it your testimony that you were never aware that Mr. Winter had a
disability during his employment?"  *Id.* at 3, 54:3-5.  Mr. Jakel responded "I am unaware
of any documentation.  His several issues that he had were discussed, that he had a
short-term memory problem due to, I think, some medical things that happened in his
past.  And we just talked about it briefly, about the things that would help him to be
successful, and I – we provided those requested materials or the things that he had –
that he had said would help him be successful.  We – we tried to provide those."  *Id.*,
54:6-14.

[12] Mr. Winter disputes this fact, stating that "Defendant has not produced any
problematic tickets, performance plans, performance-related discipline, performance
evaluations, or other evidence that supports its assertion that Plaintiff exhibited 'poor
progress.'  Defendant cannot support its allegations that Mr. Winter exhibited poor
performance.  The fact that Mr. Winter received additional tasks and never received
written discipline from Defendant directly contradicts Defendant's allegations of poor
performance."  Docket No. 40 at 5, ¶ 29.  The District has, however, identified testimony
from Mr. Jakel regarding Mr. Winter's performance, *see, e.g.*, Docket No. 34 at 7, 9,
¶¶ 44-45, 60, and Mr. Winter has failed to identify any materials in the record to counter
this assertion.  The Court therefore deems this fact admitted.

Each summer, the technology department collects all student computers and "re-images" the computers. *Id.*, ¶ 30. Re-imaging computers entails erasing all data and software from machines, installing blank operating systems, applying configuration settings to machines, installing appropriate software packages where applicable, and verifying that settings and software are installed correctly. *Id.* at 5-6, ¶ 31. During the summer of 2022, Mr. Winter was tasked with re-imaging the high school computers. *Id.*, ¶ 32. Mr. Winter was provided with checklists to perform this task. *Id.*[13] Additionally, he worked in a quiet environment with no distractions. *Id.* Mr. Winter did not request or indicate that he needed any other accommodations for this task. *Id.*, ¶ 33.[14] Mr. Winter took an unusually long time and made a number of mistakes in re-imaging the computers. *Id.*, ¶ 34.[15]

---

[13] Mr. Winter disputes this fact, stating that "Defendant did not interact with Plaintiff to determine what checklist(s) for reimaging computers would reasonably address Plaintiff's need for accommodation." Docket No. 40 at 5, ¶ 32. The Court finds this to be nonresponsive and deems this fact admitted.

[14] Mr. Winter disputes this fact, citing to the argument he made in support of his dispute of the prior fact. *See* Docket No. 40 at 5, ¶ 33. For the same reason noted in footnote 13, the Court deems this fact admitted.

[15] Mr. Winter disputes this fact, stating that, "[d]espite Defendant's allegations that all information is documented in Defendant's ticketing system, Defendant has yet to produce any ticket from Defendant's ticketing system, or any other documentation, that purports to show that Plaintiff made any mistake(s) while reimaging computers. Additionally, Defendant does not allege and cannot prove that anyone timed and maintained records of the time it took each Technology Aide to re-image each computer. Mr. Winter did not take an 'unusually long time' to complete his tasks nor did he 'make a number of mistakes' when it came to re-imaging the computers." Docket No. 40 at 5, ¶ 34. The District has, however, identified testimony from Mr. Jakel regarding Mr. Winter's performance, *see, e.g.*, Docket No. 34 at 7, 9, ¶¶ 44-45, 60, and Mr. Winter has failed to identify any materials in the record to counter this assertion. The Court therefore deems this fact admitted.

### D. **October 2022 Job Evaluation**

Per District expectations, Mr. Jakel, as Mr. Winter's supervisor, was responsible for evaluating Mr. Winter annually.  *Id.*, ¶ 35.  Mr. Winter was due for an evaluation during the 2022-2023 school year.  *Id.*, ¶ 36.  Mr. Jakel and Mr. Winter met on October 27, 2022.  *Id.*, ¶ 37.  In the evaluation, Mr. Jakel noted that Mr. Winter needed to improve with regard to documenting his tickets accurately and taking accurate notes. *Id.*, ¶ 38.[16]  Mr. Jakel rated Mr. Winter a "2" on overall performance, meaning he needed to improve.  *Id.*, ¶ 39.[17]  Mr. Jakel advised Mr. Winter to work on organizing his notes better, work through the checklists he made, and work through the checklists the District provided.  *Id.* at 6-7, ¶ 40.  Mr. Winter signed the performance evaluation without comment.  *Id.* at 7, ¶ 41.

---

[16] Mr. Winter disputes this fact, stating that, "[o]n Plaintiff's 2022-2023 Classified Personnel Evaluation [ ], Mr. Jakel rated Plaintiff with a score of 2 (Needs to Improve) for only two areas: 'Understands and completes all records, reports, and documents required,' and 'Completes tasks accurately.'  Both of these areas were previously and repeatedly identified by Plaintiff as areas for which he needed accommodation due to his disability, but Defendant did not conduct an interactive process to determine reasonable accommodations for Plaintiff."  Docket No. 40 at 6, ¶ 38.  The Court finds this to be nonresponsive and deems this fact admitted.

[17] Mr. Winter disputes this fact, stating that, "[o]f the 25 evaluation items listed on the Evaluation, Plaintiff received a score of 4 (Exceeds Expectations) for 6 areas, received a score of 3 (Meets Expectations) on 17 areas, and did not receive a score of 1 (Unsatisfactory) for any area.  *See* Defendant's Exhibit 9 to its MSJ Exhibit A.  When averaging the scores for the 25 areas listed on the Evaluation, Plaintiff's averaged overall score is 3.16 (Meets Expectations), yet Mr. Jakel wrote '2' for Plaintiff's overall score.  *Id.* at p. 3.  Additionally, despite Plaintiff's repeated disclosure to Mr. Jakel that he has a disability that affects his memory, Mr. Jakel's overall comment on the Evaluation was, 'We need to work on getting your tasks to be committed to your long-term memory.'  *Id.*  Mr. Jakel's performance expectation wholly contradicted Plaintiff's medical needs and references part of Plaintiff's disability – trouble with long-term memory retention – as further justification for a lower performance rating."  Docket No. 430 at 6, ¶ 39.  The Court finds this to be nonresponsive and deems this fact admitted.

### E.  Performance after October 2022 Job Evaluation

Mr. Winter's job performance did not improve after his evaluation.  *Id.*, ¶ 42.[18]
His tickets continued to include inaccurate information, and he did not improve his
success rate with regard to resolving low-level tickets.  *Id.*, ¶ 43.[19]  Beginning in or
around January 2023, Mr. Winter repeatedly opened tickets but failed to document any
follow up steps that he had taken to troubleshoot the problem or the steps he had taken
to try to resolve the problem.  *Id.*, ¶ 44.[20]  This created more work for the Technology
Specialists, who ended up duplicating strategies that Mr. Winter had unsuccessfully
tried because they were not documented.  *Id.*  Beginning in January of 2023, teachers
and students stopped bringing their technology concerns to Mr. Winter; instead, they
went to a high school teacher, Darren Horn, or to the Technology Specialists.  *Id.*,
¶ 45.[21]  This lack of confidence in Mr. Winter created work for Mr. Horn outside of his
job duties and added to the responsibilities of the District Technology Specialists.  *Id.*,

---

[18] Mr. Winter disputes this fact, stating that, "[d]espite Defendant's allegations
that all information is documented in Defendant's ticketing system, Defendant has yet to
produce any ticket from Defendant's ticketing system, or any other documentation, that
purports to show that Plaintiff's performance was unsatisfactory.  Plaintiff of his own
initiative took the appropriate steps to improve his notes organization and checklists
through OneNote in addition to taking Microsoft classes.  *See* Ex. 2.  Plaintiff often
received conflicting procedure instructions from Mr. Jakel, Ms. Meyer and Ms.
McConkey."  Docket No. 40 at 7, ¶ 42.  The Court finds this to be nonresponsive and
deems this fact admitted.
[19] Mr. Winter disputes this fact, citing to the argument he made in support of his
dispute of the prior fact.  *See* Docket No. 40 at 7, ¶ 43.  For the same reason noted in
footnote 18, the Court deems this fact admitted.
[20] Mr. Winter disputes this fact, citing to the argument he made in support of his
dispute of the fact asserted at Docket No. 34 at 7, ¶ 42.  *See* Docket No. 40 at 7, ¶ 44.
For the same reason noted in footnote 18, the Court deems this fact admitted.
[21] Mr. Winter disputes this fact, stating that "[w]hen Mr. Jackel emailed Darren
Horn . . . to ask if Mr. Horn was addressing many technology issues, Mr. Horn
responded 'No I am not fixing a lot there have been a few that's all . . .  It's a simple fix."
Docket No. 40 at 7, ¶ 45.  The Court finds this to be nonresponsive and deems this fact
admitted.

¶ 46.[22]  It was particularly problematic for the technology department when Mr. Horn solved technology problems for students because the problem and the resolution were not documented in the ticket system.  *Id.*, ¶ 47.[23]  The lack of documentation prevented the District from tracking problems with single computers and from tracking technology problems across the District.  *Id.* at 7-8, ¶ 48.[24]

Because of concerns that problems were not documented in the ticketing system, Mr. Jakel determined that any problems with school staff computers should go directly to the Technology Specialists.  *Id.* at 8, ¶ 49.[25]  Mr. Jakel implemented this strategy to ensure accurate documentation in the system, and in hopes that reducing Mr. Winter's workload would help his accuracy.  *Id.*, ¶ 50.[26]  This increased the workload of

---

[22] Mr. Winter disputes this fact, citing to the argument he made in support of his dispute of the prior fact and stating that "[n]o lack of confidence existed and Defendant has not produced any substantive evidence to support such an allegation."  Docket No. 40 at 7, ¶ 46.  The District has, however, identified testimony from Mr. Jakel regarding the lack of confidence in Mr. Winter, *see, e.g.*, Docket No. 34 at 7, 9, ¶¶ 44-45, 60, and Mr. Winter has failed to identify any materials in the record to counter this assertion. The Court therefore deems this fact admitted.

[23] Mr. Winter disputes this fact, citing to the argument he made in support of his dispute of the fact asserted at Docket No. 34 at 7, ¶ 45.  *See* Docket No. 40 at 7, ¶ 47. For the same reason noted in footnote 21, the Court deems this fact admitted.

[24] Mr. Winter disputes this fact, citing to the argument he made in support of his dispute of the fact asserted at Docket No. 34 at 7, ¶ 45.  *See* Docket No. 40 at 7, ¶ 48. For the same reason noted in footnote 21, the Court deems this fact admitted.

[25] Mr. Winter disputes this fact, citing to the argument he made in support of his dispute of the facts asserted at Docket No. 34 at 7-8, ¶¶ 42, 45.  *See* Docket No. 40 at 7, ¶ 49.  For the same reasons noted in footnotes 18 and 21, the Court deems this fact admitted.

[26] Mr. Winter disputes this fact, citing to the argument he made in support of his dispute of the facts asserted at Docket No. 34 at 7-8, ¶¶ 42, 45.  *See* Docket No. 40 at 7, ¶ 50.  For the same reasons noted in footnotes 18 and 21, the Court deems this fact admitted.

Technology Specialists, but was necessary for the department to perform its job duties proficiently.  *Id.*, ¶ 51.[27]

### F.  Planning for Summer 2023 Computer Re-Imaging and Mr. Winter's Request for Headphones

In or around February or March of 2023, the technology department began to prepare for reimaging computers over the summer.  *Id.*, ¶ 52.  At the time, the plan was for Mr. Winter to work with the middle school Technology Aide, Destin Brown, on the project.  *Id.*, ¶ 53.  Mr. Winter requested noise-cancelling headphones, although he did not indicate the request was related to any disability or need for accommodation.  *Id.*, ¶ 54.[28]  Mr. Jakel explained to Mr. Winter that re-imaging the computers was going to be a collaborative project, and the headphones would hinder his ability to collaborate with Mr. Brown as needed.  *Id.*, ¶ 55.[29]  Mr. Winter did not ask for noise cancelling headphones on any other occasion.  *Id.*, ¶ 56.

---

[27] Mr. Winter disputes this fact, citing to the argument he made in support of his dispute of the facts asserted at Docket No. 34 at 7-8, ¶¶ 42, 45.  *See* Docket No. 40 at 7, ¶ 51.  For the same reasons noted in footnotes 18 and 21, the Court deems this fact admitted.

[28] Mr. Winter disputes this fact, stating that he "repeatedly disclosed to Defendant that he had a disability, and that the headphones would address his medical needs."  Docket No. 40 at 8, ¶ 54.  Because Mr. Winter does not cite any evidence in the record in support of this dispute, the Court deems this fact admitted.  *See* Practice Standards (Civil cases), Chief Judge Philip A. Brimmer, § III.F.3.b.iv.

[29] Mr. Winter disputes this fact, stating that "Defendant acknowledge[s] that Plaintiff re-imaged computers the previous summer by himself and thus acknowledges that re-imaging computers is not collaborative."  Docket No. 40 at 8, ¶ 55.  The fact that Mr. Winter's work the prior summer re-imaging computers was not done in collaboration with another colleague does not create a dispute of fact as to whether Mr. Jakel told Mr. Winter that the 2023 re-imaging project would be a collaborative effort.  The Court deems this fact admitted.

### G. **The Final Months of Mr. Winter's Employment; Request for Blue-Light Glasses**

Mr. Jakel was tasked with Departmental planning each year, including making hiring decisions. *Id.* at 9, ¶ 57. Every school year in or around March, Mr. Jakel determines whether he will offer Technology Aides a notice of assignment for the following school year. *Id.*, ¶ 58.[30] He made this decision at that time because, if another Technology Aide is needed, he had time to post the job opening in a timely manner. *Id.*, ¶ 59. In March 2023, Mr. Jakel determined that he was not going to offer Mr. Winter another notice of assignment for the 2023-2024 school year because Mr. Winter was not improving in his job performance; in fact, Mr. Jakel believed it was getting worse. *Id.*, ¶ 60.[31]

On April 25, 2023, Mr. Winter sent Mr. Jakel a text message requesting prescription glasses that filter blue light. *Id.*, ¶ 61. Mr. Winter stated that he read blue light filters are helpful for people with epilepsy. *Id.* Mr. Jakel asked whether there were

---

[30] Mr. Winter disputes this fact, stating that "Defendant's Exhibit 6 to its MSJ Exhibit 6 shows that Mr. Jakel solicited comments related to Plaintiff's performance from Ms. McConkey on May 3, 2023, not in March 2023. Accordingly, Mr. Jakel was determining assignments in May, not March." Docket No. 40 at 8, ¶ 58. The fact that Mr. Jakel received an email from one of the technology specialists on May 3, 2023 detailing the specialist's concerns with Mr. Winter's performance does not contradict Mr. Jakel's statement that he had made the decision not to offer Mr. Winter another notice of assignment in March 2023. The Court deems this fact admitted.

[31] Mr. Winter disputes this fact, citing to the argument he made in support of his dispute of the facts asserted at Docket No. 34 at 9, ¶ 58, and stating that "Mr. Jakel's solicitation of performance-related comments from Ms. McConkey about Plaintiff occurred within days of Plaintiff asking Mr. Jakel for accommodation for his disability." Docket No. 40 at 8, ¶ 60. As the Court explained in footnote 30, the fact of Ms. McConkey's email does not necessarily contradict the District's assertion that Mr. Jakel had previously made a decision on the question of Mr. Winter's future employment. The Court deems this fact admitted.

other strategies that might work, such as using filters built into the computers.  *Id.*, ¶ 64.

Mr. Jakel suggested that Mr. Winter might be able to get the blue filter prescription

glasses through his District-provided health insurance.  *Id.* at 10, ¶ 65.  Mr. Jakel

advised that he and Mr. Winter speak with Marla Story, the District's Human Resources

Director.  *Id.*, ¶ 67.  Ms. Story discussed Mr. Winter's request with Mr. Jakel and

researched what accommodations are available and reasonable for filtering blue light.

*Id.*, ¶ 68.  Ms. Story determined that the District could purchase lens covers for Mr.

Winter's glasses that filter blue light.  *Id.*, ¶ 69.  On April 25, 2023, before Ms. Story was

able to discuss the lens covers with Mr. Winter, Mr. Winter emailed Ms. Story asking for

a meeting.  *Id.*, ¶ 70.  Ms. Story responded to Mr. Winter on April 26, 2023, agreeing to

meet with him and asked him to offer dates and times that they could meet.  *Id.*, ¶ 71.

On May 4, 2023, Mr. Jakel set a meeting with District Superintendent Jeremy

Burmeister and Mr. Winter.  *Id.*, ¶ 75.  At the meeting, Mr. Jakel informed Mr. Winter that

the District would not be offering him a notice of assignment for the following school

year.  *Id.* at 11, ¶ 76.  Mr. Jakel informed Mr. Winter that he could finish his assignment

through the end of the 2022-2023 school year.  *Id.*, ¶ 78.  Mr. Jakel also informed Mr.

Winter that, if he wanted to resign, the District would accept his resignation.  *Id.*, ¶ 79.

On May 4, 2023, Mr. Winter emailed Mr. Jakel and informed him that he would

resign as of May 31, 2023.  *Id.*, ¶ 80.  On Saturday, May 6, 2023, Mr. Winter emailed all

Platte Valley High School staff informing them that he was resigning as of May 5, 2023

to take advantage of another employment opportunity.  *Id.*, ¶ 81.

## II.  LEGAL STANDARD

Summary judgment is warranted under Federal Rule of Civil Procedure 56 when

the "movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986).  A disputed fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001).  Only disputes over material facts can create a genuine issue for trial and preclude summary judgment. *Faustin v. City & Cnty. of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005).  An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

Where "the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001) (quotations omitted).  "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter."  *Concrete Works of Colo., Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994).  The nonmoving party may not rest solely on the allegations in the pleadings, but instead must designate "specific facts showing that there is a genuine issue for trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quotations omitted).  "To avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case."  *Bausman*, 252 F.3d at 1115.  When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party.  *Id.*

### III. ANALYSIS

Mr. Winter brings claims for disability discrimination and for failure to accommodate under the Americans with Disabilities Act ("ADA") and the Colorado Anti-Discrimination Act ("CADA").  Docket No. 9 at 6-9; *see also* Docket No. 30 at 5-6 (interpreting the complaint to allege both discrimination and failure to accommodate claims).  The District seeks summary judgment on all four claims.  *See* Docket No. 34 at 1-2.  The Court will first analyze the disability discrimination claims and then the failure to accommodate claims.  As the Court has previously noted, Colorado state employment discrimination claims are analyzed under the same standards as federal law.  *See* Docket No. 30 at 15 (citing *Colo. C.R. Comm'n v. Big O Tires, Inc.*, 940 P.2d 397, 399-400 (Colo. 1997); *Johnson v. Weld Cnty.*, 594 F.3d 1202, 1219 (10th Cir. 2010)).

### A. Discrimination Claim

Mr. Winter alleges that he was discriminated against on the basis of his disability.  Docket No. 9 at 6-9.  When a plaintiff does not present direct evidence of discrimination,[32] a court looks to the burden-shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to evaluate disability discrimination claims arising under the ADA.  *See Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1192 (10th Cir. 2018) (applying framework to an ADA claim).

The first step of the *McDonnell Douglas* framework "requires the plaintiff to establish a prima facie case of discrimination."  *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1192 (10th Cir. 2018); *Herrmann v. Salt Lake City Corp.*, 21 F.4th 666, 678 (10th

---

[32] The Court has previously found that Mr. Winter proceeds on an indirect theory of discrimination.  *See* Docket No. 30 at 6 n.3.

Cir. 2021) (to survive summary judgment, a plaintiff must raise a genuine issue of
disputed fact for each element of a *prima facie* case).  "To establish a prima facie case
under the ADA, a plaintiff must demonstrate: (1) that [he] is a disabled person within the
meaning of the ADA; (2) that [he] is qualified, that is, [he] is able to perform the essential
functions of the job, with or without reasonable accommodation; and (3) that the
employer terminated [his] employment under circumstances which give rise to an
inference that the termination was based on [his] disability."  *Morgan v. Hilti, Inc.*, 108
F.3d 1319, 1323 (10th Cir. 1997) (internal citations omitted); *see also Herrick v. Vail
Corp.*, 2024 WL 4360502, at *5 (10th Cir. Oct. 1, 2024) ("To establish a prima facie case
on his wrongful-discharge claim, Herrick had to show: (1) he was a disabled person as
defined by the ADA; (2) he was qualified, with or without reasonable accommodation, to
perform the essential functions of his job; and (3) he was fired because of his disability."
(citation, quotation, and alterations omitted)).

If Mr. Winter demonstrates each of the elements of his prima facie case under his
ADA discrimination claim, the second step of the framework dictates that "the burden
shifts to the employer to articulate a legitimate, nondiscriminatory reason" for Mr.
Winter's termination.  *Lincoln*, 900 F.3d at 1193 (internal quotation marks and citation
omitted).  If the District offers a legitimate, non-discriminatory reason, the third step of
the framework applies, meaning that Mr. Winter can raise a genuine issue of material
fact on his discrimination claim by showing that the District's stated reason for the
employment action is a pretext for discrimination.  *Id.*

### 1.  Prima Facie Case

For an ADA claim brought under an indirect theory of discrimination, Mr. Winter
must demonstrate that he is a disabled person as defined by the ADA, that he was

qualified, with or without reasonable accommodation, to perform the essential functions of his job, and that he suffered an adverse employment action because of his disability. *Aubrey v. Koppes*, 975 F.3d 995, 1014 (10th Cir. 2020). The District challenges only the third element of the prima facie case. *See* Docket No. 34 at 13-15. The District makes two arguments as to why Mr. Winter's claim fails on this element. *Id.* First, the District asserts that Mr. Winter has failed to show that he suffered adverse employment action because he was not constructively discharged. *Id.* at 13-14. Second, the District argues that, even if Mr. Winter was constructively discharged, there is no evidence that he was terminated because of his status as a person with a disability. *Id.* at 14-15.

### a. Constructive Discharge

The District argues that Mr. Winter was not constructively discharged 1) because Mr. Winter fails to cite evidence that his working conditions were so intolerable that he had no other choice but to quit and 2) because he resigned of his own free will. *Id.* at 13-14. The Tenth Circuit has explained that courts should consider four factors in analyzing whether an employee's resignation was involuntary. *See Parker v. Bd. of Regents of Tulsa Jr. College*, 981 F.2d 1159, 1162 (10th Cir. 1992). These factors are "(1) whether the employee was given some alternative to resignation; (2) whether the employee understood the nature of the choice he was given; (3) whether the employee was given a reasonable time in which to choose; and (4) whether he was permitted to select the effective date of resignation." *Id.*

For the first factor, the fact that the employee's alternative to resignation is termination does not render the resignation involuntary unless the employer lacked good cause to believe that there were grounds for termination. *Id.* Here, the District

had good cause to believe there were grounds for termination given the undisputed facts of Mr. Winter's deficient performance of his job duties.

For the second factor, there is no evidence that Mr. Winter did not understand the nature of the choice he was given.  Instead, his May 4 and May 6, 2023 emails support the conclusion that Mr. Winter understood the nature of the choice.  *See* Docket No. 34 at 11, ¶¶ 80-81.  For the third factor, Mr. Winter was, on May 4, 2023, given the option between resignation and termination.  *Id.* at 10-11, ¶¶ 75-79.  Neither party addresses how much time Mr. Winter was given to make his decision.  However, Mr. Winter emailed Mr. Jakel later that same day and informed him that he would resign effective May 31, 2023.  *Id.* at 11, ¶ 80.  The Court finds that, given Mr. Winter's quick decision, the third factor has been satisfied.  *Cf. Harrell v. Stitt*, 2024 WL 3372624, at *4 (10th Cir. July 11, 2024) (holding that the third *Parker* factor was satisfied when the employee, upon being presented with his choices among resignation, retirement, and termination, immediately stated that he would retire).  For the fourth factor, neither party addresses whether, in the May 4 meeting, Mr. Winter was given the ability to select his resignation date; however, the fact that Mr. Winter's email to Mr. Jakel stated the date upon which Mr. Winter would resign, the Court finds that Mr. Winter evidently did have the ability to choose his resignation date.  The Court therefore finds that, under the *Parker* factors, Mr. Winter's resignation was voluntary and he was not constructively discharged.  Thus, Mr. Winter fails to demonstrate the adverse employment action element of the prima facie case.

In the alternative, even if the Court were to find that Mr. Winter was constructively discharged, his discrimination claim would still fail for the reasons discussed in the remainder of this order.

### b.  Termination Because of Disability

The District claims that "there is no evidence that [Mr. Winter's termination] had anything to do with a disability.  An employee must suffer an adverse employment action because of his status as a person with a disability to establish a prima case. . . .  Winter cannot do so."  Docket No. 34 at 14-15.  The District does not develop its argument beyond these two sentences.

To show he was fired because of his disability, Mr. Winter must "present some affirmative evidence that disability was a determining factor in the employer's decision." *Hampton v. Utah Dep't of Corr.*, 87 F.4th 1183, 1197 (10th Cir. 2023) (quoting *Morgan*, 108 F.3d at 1323).  "At the summary judgment stage, this burden is neither 'onerous' nor 'perfunctory.'"  *Id.* at 1198 (quoting *Morgan*, 108 F.3d at 1323-24).  "The plaintiff must present evidence that, if the trier of fact finds it credible, and the employer remains silent, [he] would be entitled to judgment as a matter of law."  *Morgan*, 108 F.3d at 1324.

The Court finds that Mr. Winter has presented evidence that gives rise to an inference that his termination was based on disability.  Mr. Winter informed Mr. Jakel and others that he struggled with memory, completed tasks slowly, and had been diagnosed with PTSD and brain damage.  Docket No. 34 at 4, ¶¶ 16-17.  Mr. Winter asked that his colleagues be patient with him in completing tasks.  *Id.*, ¶ 17.  Mr. Winter, however, took "an unusually long time" in completing assigned tasks.  *Id.* at 6, ¶ 34.  Mr. Winter's burden at this step is not onerous, and the Court finds that these facts, viewed in a light most favorable to Mr. Winter, are sufficient to give rise to an inference that Mr.

Winter's slowness at completing tasks was due to his memory struggles and brain damage and that these disability-related performance issues were a determining factor in the District's termination decision.

As the District does not challenge the other elements of the prima facie case – which consider whether Mr. Winter was disabled within the meaning of the ADA and whether Mr. Winter was qualified to perform the essential functions of his job – the Court finds that Mr. Winter has made a prima facie case of wrongful termination.

### 2. Legitimate, Non-Discriminatory Reason

Since Mr. Winter has made a sufficient showing that his termination occurred under circumstances giving rise to an inference of discrimination, the District must "articulate a legitimate, nondiscriminatory reason" for the termination. *Lincoln*, 900 F.3d at 1193 (internal quotation marks and citation omitted). The District's "burden is to establish facts from which the court may infer a proper reason behind defendant[s'] decision to discharge plaintiff." *Richardson v. Topeka Metro. Transit Auth.*, 987 F. Supp. 887, 891 (D. Kan. 1997). "This burden is one of production, not persuasion; it can involve no credibility assessment." *Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1149 (10th Cir. 2011) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)). The burden has been characterized as "exceedingly light." *Id.* (citation omitted).

The District asserts that it fired Mr. Winter because Mr. Jakel believed that Mr. Winter's job performance, rather than improving with time, was getting worse. Docket No. 34 at 9, ¶ 60. Mr. Winter's difficulties with properly documenting issues with school technology resulted in an increase in work for other members of the District's technology team, as well as for a high school teacher whose job duties did not include

fixing technology problems.  *Id.* at 7, ¶¶ 45-47.  "Poor performance is a quintessentially
legitimate and nondiscriminatory reason for termination."  *Bryant v. Farmers Ins. Exch.*,
432 F.3d 1114, 1125 (10th Cir. 2005) (citation omitted).  The Court finds that the
undisputed facts show that the District's stated reason for terminating Mr. Winter is
legitimate and non-discriminatory.[33]

### 3.  Pretext

Given that the District has shown a legitimate, non-discriminatory reason for not
renewing Mr. Winter's contract, Mr. Winter must demonstrate that there is a dispute of
material fact as to whether the District's proffered reason for the nonrenewal of Mr.
Winter was pretextual.  "A plaintiff demonstrates pretext by showing either that a
discriminatory reason more likely motivated the employer or that the employer's
proffered explanation is unworthy of credence."  *Foster v. Mountain Coal Co., LLC*, 830
F.3d 1178, 1194 (10th Cir. 2016) (quoting *Zamora v. Elite Logistics, Inc.*, 478 F.3d
1160, 1166 (10th Cir. 2007)).  "Pretext can be inferred from evidence revealing
weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the

---

[33] Although not necessarily argued by either party, an issue raised by the facts of
the case is whether poor job performance can still serve as a legitimate basis for
termination when the employee's disability appears to be positively correlated with the
employee's poor performance.  Courts have held, or at least indicated, that performance
issues still constitute a legitimate basis for termination in these circumstances.  *See
Williams v. Widnall*, 79 F.3d 1003, 1007 (10th Cir. 1996) (holding that an employer does
not violate the ADA when it takes into account the effects of an employee's disability);
*Gazaway v. Makita U.S.A., Inc.*, 11 F. Supp. 2d 1281, 1290 (D. Kan. 1998), *aff'd*, 182
F.3d 931 (10th Cir. 1999) ("the court believes that the Tenth Circuit would conclude that
an employer's decision to terminate a disabled employee in a reduction in force based
on a consequence of the employee's disability is not, without more, actionable under the
ADA.") (emphasis omitted); *Green v. U.S. Anesthesia Partners of Colo., Inc.*, 624 F.
Supp. 3d 1201, 1213 (D. Colo. 2022), *aff'd*, 2023 WL 7015660 (10th Cir. Oct. 25, 2023);
*Matthews v. Commonwealth Edison Co.*, 128 F.3d 1194, 1198 (7th Cir. 1997) ("foolish
or not, [the termination decision] was not actionable under the ADA because it was not
based on disability, although it was correlated with it.").

employer's explanation." *Walkingstick Dixon v. Okla. ex rel. Reg'l Univ. Sys. of Okla. Bd. of Regents*, 125 F.4th 1321, 1337 (10th Cir. 2025) (citation omitted). "The critical question regarding this aspect of the *McDonnell Douglas* rubric is whether a reasonable factfinder could rationally find the employer's rationale unworthy of credence and hence infer that the employer did not act for the asserted non-retaliatory reasons." *Id.* (quoting *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1234 (10th Cir. 2015)). "The plaintiff need not show both that the defendant's reasons were a pretext and that the real reason was discrimination – the fact of pretext alone may allow the inference of discrimination." *Id.* (quoting *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1135-36 (10th Cir. 2003)).

When evaluating pretext, courts "examine the facts as they appear to the person making the decision, and do not look to the plaintiff's subjective evaluation of the situation." *Lewis v. Peabody Rocky Mountain Servs., LLC*, 2023 WL 4927248, at *3 (10th Cir. Aug. 2, 2023) (unpublished) (quoting *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 971 (10th Cir. 2017) (quotations omitted)). "At this stage, the relevant inquiry is whether the employee has created a genuine issue of material fact as to whether the employer honestly believed its proffered reasons and 'acted in good faith upon the beliefs.'" *Id.* (quoting *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1170 (10th Cir. 2007)); *Litzsinger v. Adams Cnty. Coroner's Off.*, 25 F.4th 1280, 1287 (10th Cir. 2022) ("The plaintiff must come forward with evidence that the employer didn't really believe its proffered reasons for action and thus may have been pursuing a hidden discriminatory agenda." (citation and quotation omitted)).

The Court understands Mr. Winter to offer two reasons why there is a genuine dispute of material fact as to whether it is more likely that the District terminated him

because of his disability.  Docket No. 40 at 18-19.  First, Mr. Winter states that his

"2022-2023 Evaluation, completed in October 2022, reflected that Plaintiff was meeting

expectations, and Defendant provides no evidence of performance issues involving

Plaintiff during the Spring 2023 semester that warranted termination."  *Id.* at 18.  The

undisputed facts discredit this argument.  In the October 2022 performance evaluation,

Mr. Winter received a "2" on overall performance, meaning that he needed to improve.

Docket No. 34 at 6, ¶ 39.[34]  Further, there are a number of undisputed facts regarding

issues with Mr. Winter's performance in the Spring 2023 semester and how those

performance issues impacted the District's technology services.  *Id.* at 7-8, ¶¶ 44-51.

The Court finds that no reasonable juror could find that performance issues did not

justify Mr. Winter's termination, and thus no reasonable juror could find pretext based on

this argument.

Second, Mr. Winter notes the temporal proximity between his April 25, 2023

request for blue-light glasses and the May 4, 2023 meeting at which he was told that he

could be terminated or resign.  *Id.* at 18-19.  In support of this argument, Mr. Winter

states that the fact that, on May 3, 2023, Ms. McConkey provided Mr. Jakel with

---

[34] The Court notes that Mr. Winter's response to the District's undisputed fact on this point makes much of the fact that several of the component scores within Mr. Winter's evaluation, as opposed to the overall score of "2," included scores of "4," meaning "exceeds expectations," and "3," meaning "meets expectations," in a number of areas.  *See* Docket No. 40 at 6, ¶ 39.  Mr. Winter, however, failed to raise these facts when he had the opportunity to do so in his response brief as part of a section for either additional undisputed facts or additional disputed facts.  *See* Practice Standards (Civil cases), Chief Judge Philip A. Brimmer, § III.F.3.b.v.  Thus, these facts are not properly before the Court on summary judgment.  Moreover, even if the Court were to consider the information, the overall rating of "2," coupled with component scores of "2" in several areas, would still undermine Mr. Winter's argument that there were not performance issues identified in his evaluation that would merit termination.

comments regarding Mr. Winter's job performance undermines any assertion by the

District that Mr. Jakel had made the termination decision in March 2023.  *Id.* at 18-19.

As a preliminary matter, the fact of Ms. McConkey's comments to Mr. Jakel is not

properly before the Court.  The relevant email is cited by the District as one of several

exhibits supporting an asserted undisputed fact.  *See id.* at 9, ¶ 60 (citing, among other

exhibits, Docket No. 34-22) and is cited by Mr. Winter several times in his responses to

the undisputed facts proffered by the District.  *See, e.g.*, Docket No. 40 at 8, ¶¶ 58-60.

However, because neither party identifies Ms. McConkey's email as an undisputed fact,

the email cannot serve as a basis for creating a genuine dispute of material fact.

Moreover, even if the Court did consider this email, the Court finds that it would not help

Mr. Winter's case.  The email lists a variety of issues with Mr. Winter's job performance.

*See* Docket No. 34-22 at 1-3.  The issues listed in the email are similar to the

performance-related issues identified in the undisputed facts as occurring throughout

Mr. Winter's employment.  *Compare* Docket No. 34-22 at 1-3 *with, e.g.*, Docket No. 34

at 7-8, ¶¶ 44-51.  The email gives no indication that it provides information of which Mr.

Jakel was previously unaware.  The Court finds that no reasonable juror could conclude

from this email that Mr. Jakel was seeking to fire Mr. Winter due to his disability or due

to an accommodation request made a week prior.

  The temporal proximity between Mr. Winter's request for blue-light glasses and

his termination also fails to create a genuine dispute of material fact regarding pretext.

"[T]emporal proximity alone is insufficient to raise a genuine issue of material fact

concerning pretext," *Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1213 (10th Cir.

2007), and the facts surrounding the request for blue-light glasses do not permit any

inferences of discriminatory motive on the part of Mr. Jakel or any other District employee.  Instead, the facts show that Mr. Jakel, upon receiving Mr. Winter's April 25, 2023 request for an accommodation, offered Mr. Winter two potential solutions: using a blue-light filter built into District computers or obtaining blue-light glasses through the District's vision insurance program.  Docket No. 34 at 9-10, ¶¶ 64-65.  Further, Mr. Jakel suggested that Mr. Winter speak with Ms. Story, the District's human resources director. *Id.* at 10, ¶ 67.  Mr. Jakel and Ms. Story discussed the request, and Ms. Story researched the issue, determining that the District could purchase a lens cover for Mr. Winter's glasses.  *Id.*, ¶¶ 68-69.  On April 25, 2023, before Ms. Story could discuss the lens cover with Mr. Winter, Mr. Winter contacted Ms. Story to ask for a meeting.  *Id.*, ¶ 70.  On April 26, 2023, Ms. Story responded asking for dates and times to meet.  *Id.*, ¶ 71.  Although the meeting apparently did not take place, nothing about these facts – which show a willingness on the part of Mr. Jakel and Ms. Story to accommodate Mr. Winter's need – provide a basis from which a reasonable juror could conclude that a discriminatory basis is the more likely explanation for the District's decision to terminate Mr. Winter.

The Court finds that Mr. Winter has failed to raise a genuine issue of material fact that the District's basis for terminating Mr. Winter was pretextual.  Given that, and given the District's proffered legitimate, non-discriminatory basis for termination, the Court finds that the District is entitled to summary judgment on the ADA and CADA discrimination claims.

### B.  Failure to Accommodate Claim

Mr. Winter alleges that the District failed to provide him with a reasonable accommodation.  Docket No. 9 at 6-9.  For a failure-to-accommodate claim, Mr. Winter

must allege 1) he was disabled within the meaning of the ADA, 2) he was otherwise qualified for his job, 3) he requested a plausibly reasonable accommodation, and 4) the District refused to accommodate his disability.  *See Aubrey*, 975 F.3d at 1005.  The Tenth Circuit has explained that "[e]stablishing a prima facie claim is not onerous."  *Id.* (citing *Osborne v. Baxter Healthcare Corp.*, 798 F.3d 1260, 1266 (10th Cir. 2015)).

The District's arguments regarding the failure-to-accommodate claim discuss three potential accommodations: written instructions, noise-cancelling headphones, and a blue-screen shield.  *See* Docket No. 34 at 17-19.  The Court will only discuss the issue of written instructions.  Mr. Winter's complaint mentioned both the noise-cancelling headphones and the blue-screen shield.  *See, e.g.*, Docket No. 9 at 2, ¶ 4. However, in ruling on the District's motion to dismiss, the Court found that Mr. Winter's only sufficient claim of a denied accommodation involved the request for written instructions.  *See* Docket No. 30 at 14 ("Mr. Winter does not allege why he requested a blue screen shield and noise-cancelling headphones as necessary accommodations to address memory issues and sequencing issues.").  Mr. Winter's failure-to-accommodate claim cannot survive summary judgment on a theory of denied accommodations that he did not properly allege in the complaint.  *See Hutchison v. Ranch & Home Supply, LLC*, No. 23-cv-00999-PAB-KAS, 2025 WL 933808, at *10 n.23 (D. Colo. Mar. 27, 2025) (finding, in a case involving the Family Medical Leave Act, that the plaintiff could not assert at summary judgment that she suffered from a "chronic condition" when her amended complaint alleged only that she was "undergoing continuous treatment."); *see also Garrison v. Admin. Comm. of Delta Air Lines, Inc.*, No. 20-cv-01921-NYW, 2023

WL 2163566, at *10 (D. Colo. Feb. 22, 2023).[35]  Thus, the Court will consider only whether Mr. Winter's claim survives based on a failure of the District to accommodate Mr. Winter's request for written instructions.

The District asserts that Mr. Winter asked for written instructions to aid him in his job duties and that, in response to that request, Mr. Jakel provided Mr. Winter with checklists detailing the instructions for specific tasks and assisted Mr. Winter in using those checklists.  Docket No. 34 at 18.  The Court understands Mr. Winter to make two arguments as to why his request for the reasonable accommodation of written instructions was not met.  Docket No. 40 at 14-17, 19.

The first of these arguments centers on the fact that Mr. Jakel, when recounting in his deposition his conversation with Mr. Winter about Mr. Winter's mental limitations, stated "I don't remember discussing a disability."  *See* Docket No. 40-3 at 1, 48:2-6.  Mr. Jakel's statement was in response to the question, "[D]o you recall when you first learned of Mr. Winter's disability?"  *See id.*  Mr. Winter argues that, based on this statement, no interactive process occurred.  Docket No. 40 at 19.  As a threshold matter, Mr. Winter did not allege Mr. Jakel's deposition answer as an additional undisputed or disputed material fact, as required by the Court's practice standards. Practice Standards (Civil cases), Chief Judge Philip A. Brimmer, § III.F.3.b.v.  But, in order to address fully Mr. Winter's arguments, the Court will consider it.

---

[35] For the same reasons, the Court rejects what appears to be an attempt by Mr. Winter in the response brief to assert that he requested the reasonable accommodations of "patience (i.e., extra time to complete tasks)" and "assistance with the ticketing system."  *See* Docket No. 40 at 15.

The requirement for an employer to engage in an interactive process is "inherent in the statutory requirement that the employer offer a disabled, but otherwise qualified employee a reasonable accommodation." *Aubrey*, 975 F.3d at 1007 (citations omitted). "The interactive process requires the good faith participation of both the employer and employee." *Id.* (emphasis omitted). Although the exact shape of the interactive process "will necessarily vary from situation to situation and no rules of universal application can be articulated," the process must include "good-faith communications between the employer and employee." *Bartee v. Michelin N. Am., Inc.*, 374 F.3d 906, 916 (10th Cir. 2004) (citing *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1172-73 (10th Cir. 1999)).

Here, Mr. Winter informed Mr. Jakel and others that he struggled with memory, completed tasks slowly, and had been diagnosed with PTSD and brain damage. Docket No. 34 at 4, ¶¶ 16-17. Mr. Jakel and Mr. Winter discussed Mr. Winter's needs. *Id.*, ¶ 19. Mr. Jakel asked what Mr. Winter needed to do his job, and Mr. Winter stated that he benefits from written instructions, including checklists. *Id.*, ¶ 20. Mr. Jakel and others then provided Mr. Winter with written instructions and checklists to perform his job duties, including instructions for changing passwords on computers, a checklist and instructions for re-imaging computers, a computer troubleshooting flowchart, and several other checklists. *Id.* at 4-5, ¶¶ 21-22. Mr. Winter also told Mr. Jakel that he would learn and remember things better if Mr. Winter took notes and developed his own checklists. *Id.* at 5, ¶ 23. Mr. Jakel and others allowed Mr. Winter to take notes, reminded Mr. Winter to take notes when they observed he was not doing so, and supported him in the development of his own checklists. *Id.*, ¶ 24. When, over a year into the job, Mr. Winter continued to have performance issues, Mr. Jakel advised Mr.

Winter to work on taking accurate notes, to organize his notes better, and to work through the checklists that the District had provided and that Mr. Winter had created. *Id.* at 6-7, ¶¶ 38-40.  Despite the fact that Mr. Jakel apparently did not consider Mr. Winter's diagnoses of PTSD and brain damage to be a "disability," the Court finds that no reasonable juror could conclude that Mr. Jakel's actions provided anything less than the kind of good-faith engagement that constitutes an interactive process.  *See Bartee*, 374 F.3d at 916.  The Court thus rejects Mr. Winter's argument on this point.

Mr. Winter's second argument is that the checklists he received were "form checklists" and were not customized to his needs or the result of any collaboration between Mr. Winter and other District employees.  Docket No. 40 at 15-16.  The Court understands this to be an argument that the accommodation that the District provided was not a reasonable one.  Mr. Winter has not identified any evidence that he asked for customized instructions or expressed a concern regarding the sufficiency of the checklists provided to him.  Even if he did, the question is not whether the accommodation Mr. Winter received is the exact one he requested.  Rather, the Court must consider whether the accommodation Mr. Winter received was reasonable.  *See Midland Brake*, 180 F.3d at 1177-78 (holding that an employer is not obligated to provide the employee the accommodation he or she requests or prefers; the employer need only offer a reasonable accommodation).  Although he complains that the instructions and checklists were not the result of a collaborative process, Mr. Winter has not identified any deficiencies with the instructions and checklists he received.  Thus, the Court finds that Mr. Winter has failed to create a genuine dispute of material fact as to whether the District refused to accommodate his disability.  The Court will therefore

grant summary judgment to the District on the ADA and CADA failure-to-accommodate

claims.

## IV. CONCLUSION

It is therefore

**ORDERED** that Defendant's Motion for Summary Judgment [Docket No. 34] is

**GRANTED**.  It is further

**ORDERED** that the claims in plaintiff's Amended Complaint [Docket No. 9] are

**DISMISSED with prejudice**.  It is further

**ORDERED** that this case is closed.


DATED February 24, 2026.                     BY THE COURT:

                                             s/ Philip A. Brimmer
                                             PHILIP A. BRIMMER
                                             Chief United States District Judge